1  McGREGOR W. SCOTT
   United States Attorney
2  PAUL HEMESATH
   GRANT B. RABENN
3  Assistant United States Attorneys
   2500 Tulare Street, Suite 4401
4  Fresno, CA 93721
   Telephone: (559) 497-4000
5  Facsimile: (559) 497-4099

6  BRIAN BENCZKOWSKI
   Assistant Attorney General
7  Criminal Division, U.S. Department of Justice
   LOUISA K. MARION
8  Senior Counsel
   Computer Crime and Intellectual Property Section
9  950 Pennsylvania Avenue, N.W.
   John C. Keeney Bldg., Suite 600
10 Washington, DC 20530-0001
   Telephone: (202) 514-1026
11

12 Attorneys for Plaintiff
   United States of America

13

14                   IN THE UNITED STATES DISTRICT COURT

15                     EASTERN DISTRICT OF CALIFORNIA

16  UNITED STATES OF AMERICA,          CASE NO. 1:17-CR-00301-DAD-BAM

17                 Plaintiff,          PLEA AGREEMENT

18           v.                        DATE:
                                       TIME: a.m.
19  BRYAN CONNOR HERRELL,              COURT: Hon. Dale A. Drozd

20                 Defendant.

21

22                    **I.    INTRODUCTION**

23      A.    **Scope of Agreement**

24      The indictment in this case charges the defendant with a violation of 18 U.S.C. § 1962(d)

25  (conspiracy to engage in a racketeer influenced corrupt organization).  This document contains the

26  complete plea agreement between the United States Attorney's Office for the Eastern District of

27  California (the "government"), the Computer Crime and Intellectual Property Section of the U.S.

28

Department of Justice, Criminal Division, and the defendant regarding this case. This plea agreement is limited to the United States Attorney's Office for the Eastern District of California and the U.S. Department of Justice's Criminal Division and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities.

### B.   Court Not a Party

The Court is not a party to this plea agreement. Sentencing is a matter solely within the discretion of the Court, and the Court may take into consideration any and all facts and circumstances concerning the criminal activities of defendant, including activities that may not have been charged in the indictment. The Court is under no obligation to accept any recommendations made by the government, and the Court may in its discretion impose any sentence it deems appropriate up to and including the statutory maximum stated in this plea agreement.

If the Court should impose any sentence up to the maximum established by the statute, the defendant cannot, for that reason alone, withdraw his guilty plea, and he will remain bound to fulfill all of the obligations under this plea agreement. The defendant understands that neither the prosecutor, defense counsel, nor the Court can make a binding prediction or promise regarding the sentence he will receive.

## II.   DEFENDANT'S OBLIGATIONS

### A.   Guilty Plea

The defendant will plead guilty to 18 U.S.C. § 1962(d) (conspiracy to engage in a racketeer influenced corrupt organization). The defendant agrees that he is in fact guilty of this charge and that the facts set forth in the Factual Basis For Plea attached hereto as Exhibit A are accurate.

The defendant agrees that this plea agreement will be filed with the Court and become a part of the record of the case. The defendant understands and agrees that he will not be allowed to withdraw his plea should the Court not follow the government's sentencing recommendations.

The defendant agrees that the statements made by him in signing this Agreement, including the factual admissions set forth in the factual basis, shall be admissible and useable against the defendant by the United States in any subsequent criminal or civil proceedings, even if the defendant fails to enter a guilty plea pursuant to this Agreement. The defendant waives any rights under Rule 11(f) of the Federal

Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence, to the extent that these rules are inconsistent with this paragraph or with this Agreement generally.

**B.    Sentencing Recommendation**

The defendant and his counsel may recommend whatever sentence they deem appropriate pursuant to 18 U.S.C. § 3553(a).

**C.    Special Assessment**

The defendant agrees to pay a special assessment of $100 at the time of sentencing by delivering a check or money order payable to the United States District Court to the United States Probation Office immediately before the sentencing hearing.

**D.    Defendant's Violation of Plea Agreement or Withdrawal of Plea**

If the defendant violates this plea agreement in any way, withdraws his plea, or tries to withdraw his plea, this plea agreement is voidable at the option of the government. The government will no longer be bound by its representations to the defendant concerning the limits on criminal prosecution and sentencing as set forth herein. One way a defendant violates the plea agreement is to commit any crime or provide any statement or testimony which proves to be knowingly false, misleading, or materially incomplete. Any post-plea conduct by a defendant constituting obstruction of justice will also be a violation of the agreement. The determination whether the defendant has violated the plea agreement shall be decided under a probable cause standard.

If the defendant violates the plea agreement, withdraws his plea, or tries to withdraw his plea, the government shall have the right: (1) to prosecute the defendant on any of the counts to which he pleaded guilty; (2) to reinstate any counts that may be dismissed pursuant to this plea agreement; and (3) to file any new charges that would otherwise be barred by this plea agreement. The defendant shall thereafter be subject to prosecution for any federal criminal violation of which the government has knowledge, including perjury, false statements, and obstruction of justice. The decision to pursue any or all of these options is solely in the discretion of the United States Attorney's Office and the U.S. Department of Justice's Criminal Division.

By signing this plea agreement, the defendant agrees to waive any objections, motions, and defenses that the defendant might have to the government's decision to exercise the options stated in the

previous paragraph. Any prosecutions that are not time-barred by the applicable statute of limitations as of the date of this plea agreement may be commenced in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement and the commencement of any such prosecutions. The defendant agrees not to raise any objections based on the passage of time with respect to such counts including, but not limited to, any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment to any counts that were not time-barred as of the date of this plea agreement.

In addition: (1) all statements made by the defendant to the government or other designated law enforcement agents, or any testimony given by the defendant before a grand jury or other tribunal, whether before or after this plea agreement, shall be admissible in evidence in any criminal, civil, or administrative proceedings hereafter brought against the defendant; and (2) the defendant shall assert no claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by the defendant before or after this plea agreement, or any leads derived therefrom, should be suppressed. By signing this plea agreement, the defendant waives any and all rights in the foregoing respects.

## E.   Forfeiture

The defendant agrees to forfeit to the United States voluntarily and immediately all of his right, title, and interest to any and all assets subject to forfeiture pursuant to 18 U.S.C. §§ 1963(a)(1) - (a)(3). Those assets include, but are not limited to, the following:

1. One cryptocurrency wallet containing approximately one Bitcoin,
2. An assortment of counterfeit "Magic: The Gathering" and sports collectible cards,
3. Approximately $745.00 in U.S. Currency,
4. 139 gold coins, one ounce each,
5. 8 silver dollar coins, one ounce each,
6. One $1,000 bill encased in hard plastic, and
7. One German August Schwer Cuckoo Clock.

The defendant agrees that the listed assets constitute property he acquired an interest in or maintained in violation of 18 U.S.C. § 1962(d); constitute property he had an interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over any enterprise which the defendant established, operated, controlled, conducted, or participated in the

conduct of, in violation of 18 U.S.C. § 1962(d); and constitutes or is derived from proceeds which the defendant obtained, directly or indirectly, from racketeering activity in violation of 18 U.S.C. § 1962(d).

The defendant agrees to fully assist the government in the forfeiture of the listed assets and to take whatever steps are necessary to pass clear title to the United States. The defendant shall not sell, transfer, convey, or otherwise dispose of any of his assets, including but not limited to, the above-listed assets.

The defendant agrees not to file a claim to any of the listed property in any civil proceeding, administrative or judicial, which may be initiated. The defendant agrees to waive his right to notice of any forfeiture proceeding involving this property, and agrees to not file a claim or assist others in filing a claim in that forfeiture proceeding.

The defendant knowingly and voluntarily waives his right to a jury trial on the forfeiture of assets. The defendant knowingly and voluntarily waives all constitutional, legal, and equitable defenses to the forfeiture of these assets in any proceeding. The defendant agrees to waive any jeopardy defense, and agrees to waive any claim or defense under the Eighth Amendment to the United States Constitution, including any claim of excessive fine, to the forfeiture of the assets by the United States, the State of California or its subdivisions. The defendant waives oral pronouncement of forfeiture at the time of sentencing, and any defenses or defects that may pertain to the forfeiture.

## III.    THE GOVERNMENT'S OBLIGATIONS

### A.    Recommendations

#### 1.    Incarceration Range

The government will recommend that the defendant be sentenced to the low end of the applicable guideline range for his offense, as determined by the Court. The government may recommend whatever it deems appropriate as to all other aspects of sentencing.

#### 2.    Acceptance of responsibility

The government will recommend a three-level reduction in the computation of defendant's offense level if he clearly demonstrates acceptance of responsibility for his conduct as defined in U.S.S.G. § 3E1.1. This includes the defendant meeting with and assisting the probation officer in the preparation of the pre-sentence report, being truthful and candid with the probation officer, and not

otherwise engaging in conduct that constitutes obstruction of justice within the meaning of U.S.S.G § 3C1.1, either in the preparation of the pre-sentence report or during the sentencing proceeding.

**B.    Use of Information for Sentencing**

The government is free to provide full and accurate information to the Court and the United States Probation Office ("Probation"), including answering any inquiries made by the Court and/or Probation, and rebutting any inaccurate statements or arguments by the defendant, his attorney, Probation, or the Court. The defendant also understands and agrees that nothing in this Plea Agreement bars the government from defending on appeal or collateral review any sentence that the Court may impose.

## IV.    ELEMENTS OF THE OFFENSE

At a trial, the government would have to prove beyond a reasonable doubt the following elements of the offense to which the defendant is pleading guilty, 18 U.S.C. § 1962(d) (conspiracy to engage in a racketeer influenced corrupt organization):

1.    The charged enterprise – the AlphaBay Organization in this case – was or would be established;

2.    The enterprise was or would be engaged in, or its activities affected or would affect, interstate or foreign commerce;

3.    The defendant knowingly agreed that a conspirator would be associated with the enterprise;

4.    The defendant knowingly agreed that a conspirator would conduct or participate, either directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity; and

5.    The defendant knowingly agreed that a conspirator would commit at least two acts of racketeering activity.

## V.    MAXIMUM SENTENCE

**A.    Maximum penalty**

The maximum sentence that the Court can impose is 20 years of incarceration, a fine of $250,000 or twice the proceeds of the offense, a three-year period of supervised release, and a special assessment

of $100. In addition, the defendant may be ineligible for certain federal and/or state assistance and/or benefits, pursuant to 21 U.S.C. § 862. By signing this plea agreement, the defendant also agrees that the Court can order the payment of restitution for the full loss caused by the defendant's wrongful conduct. The defendant agrees that the restitution order is not restricted to the amounts alleged in the specific count to which the defendant is pleading guilty. The defendant further agrees, as noted above, that he will not attempt to discharge in any present or future bankruptcy proceeding any restitution imposed by the Court.

### B.      Violations of Supervised Release

The defendant understands that if he violates a condition of supervised release at any time during the term of supervised release, the Court may revoke the term of supervised release and require the defendant to serve up to two years of additional imprisonment.

## VI.      SENTENCING DETERMINATION

### A.      Statutory Authority

The defendant understands that the Court must consult the Federal Sentencing Guidelines and must take them into account when determining a final sentence. The defendant understands that the Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the Sentencing Guidelines and must take them into account when determining a final sentence. The defendant further understands that the Court will consider whether there is a basis for departure from the guideline sentencing range (either above or below the guideline sentencing range) because there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines. The defendant further understands that the Court, after consultation and consideration of the Sentencing Guidelines, must impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

### B.      Guideline Calculations

The government and the defendant agree that the following is their present best estimate of the sentencing guidelines variables. These estimates shall not be binding on the Court, the Probation Office, or the parties:

| Base Offense Level:  (based on drug quantities) | +38 | § 2E1.1(a)(1) |
| | | § 2D1.1(a)(5) & (c)(1) |

Specific Offense Characteristics:
   Interactive computer service                      +2    § 2D1.1(b)(7)

Acceptance of Responsibility:                     −3

*Criminal History Category: II*

**Sentencing Range:**                    **37/II = 235 to 293 months**

The parties agree that they will not seek or argue in support of any other specific offense characteristics, Chapter Three adjustments (other than the decrease for "Acceptance of Responsibility"), or cross-references, except that the government may move for a departure or adjustment based on defendant's post-plea obstruction of justice (§3C1.1).  Both parties agree not to move for, or argue in support of, any departure from the Sentencing Guidelines.

The defendant is free to recommend to the Court whatever sentence he believes is appropriate under 18 U.S.C. § 3553(a).  The government is not obligated to recommend any specific sentence.

## VII.    WAIVERS

### A.    Waiver of Constitutional Rights

The defendant understands that by pleading guilty he is waiving the following constitutional rights:  (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to be assisted at trial by an attorney, who would be appointed if necessary; (d) to subpoena witnesses to testify on his behalf; (e) to confront and cross-examine witnesses against him; and (f) not to be compelled to incriminate himself.

### B.    Waiver of Appeal and Collateral Attack

The defendant understands that the law gives the defendant a right to appeal his guilty plea, conviction, and sentence.  The defendant agrees as part of his plea/pleas, however, to give up the right to appeal the guilty plea, conviction, and the sentence imposed in this case.  The defendant understands that this waiver includes, but is not limited to, any and all constitutional and/or legal challenges to the defendant's conviction and guilty plea, including arguments that the statutes to which defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts attached to this

agreement is insufficient to support the defendant's plea of guilty. The defendant specifically gives up the right to appeal any order of restitution the Court may impose.

Notwithstanding the defendant's waiver of appeal, the defendant will retain the right to appeal if one of the following circumstances occurs: (1) the sentence imposed by the District Court exceeds the statutory maximum; and/or (2) the government appeals the sentence in the case. The defendant understands that these circumstances occur infrequently and that in almost all cases this Agreement constitutes a complete waiver of all appellate rights.

In addition, regardless of the sentence the defendant receives, the defendant also gives up any right to bring a collateral attack, including a motion under 28 U.S.C. § 2255 or § 2241, challenging any aspect of the guilty plea, conviction, or sentence, except for non-waivable claims.

If the defendant ever attempts to vacate his plea, dismiss the underlying charges, or modify or set aside his sentence on any of the counts to which he is pleading guilty, the government shall have the rights set forth in paragraph II.D (Defendant's Violation of Plea Agreement) herein.

## C.   Waiver of Attorneys' Fees and Costs

The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the investigation and prosecution of all charges in the above-captioned matter and of any related allegations (including without limitation any charges to be dismissed pursuant to this plea agreement and any charges previously dismissed).

## VIII.   ENTIRE PLEA AGREEMENT

Other than this plea agreement, no agreement, understanding, promise, or condition between the government and the defendant exists, nor will such agreement, understanding, promise, or condition exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and counsel for the United States.

## IX.   APPROVALS AND SIGNATURES

## A.   Defense Counsel

I have read this plea agreement and have discussed it fully with my client. The plea agreement accurately and completely sets forth the entirety of the agreement. I concur in my client's decision to

plead guilty as set forth in this plea agreement.

Dated: _1-2-20_                     _____
                                    JEFFREY T. HAMMERSCHMIDT
                                    Counsel for Defendant

## B. **Defendant**

I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my case. No other promises or inducements have been made to me, other than those contained in this plea agreement. In addition, no one has threatened or forced me in any way to enter into this plea agreement. Finally, I am satisfied with the representation of my attorney in this case.

Dated: _1-2-20_                     _____
                                    BRYAN CONNOR HERRELL,
                                    Defendant

## C. **Attorney for the United States**

I accept and agree to this plea agreement on behalf of the government.

Dated:                                    McGREGOR W. SCOTT
                                          United States Attorney

1/27/2020                    By:
                                          PAUL HEMESATH
                                          Assistant United States Attorney

Dated: 1/27/2020                          BRIAN BENCZKOWSKI
                                          Assistant Attorney General

                             By:    /s/ Louisa Marion
                                          LOUISA K. MARION
                                          Senior Counsel
                                          Computer Crime and Intellectual Property Section

# EXHIBIT "A"
## Factual Basis for Plea

If this matter proceeded to trial, the United States would establish the following facts beyond a reasonable doubt:

## A. Introduction

Defendant BRYAN CONNOR HERRELL moderated thousands of illegal transactions on the AlphaBay Market ("AlphaBay"), a website on the Darkweb that was administered by a criminal enterprise.

## B. The Darkweb, Tor, and Bitcoin

The Darkweb is a part of the World Wide Web accessible only through The Onion Router ("Tor") network, a special network of computers on the internet designed to conceal the true IP addresses of the computers on the network. As such, the true IP addresses of the users of AlphaBay, as well as the AlphaBay site, were anonymized through the Tor network, making it difficult for law enforcement to identify those users and the site's operators.

AlphaBay permitted its users to transact only in digital currencies, predominantly in Bitcoin. Digital currencies are electronically-sourced units of value that can be used as a substitute for government-issued currency.

Transactions on AlphaBay occurred through digital currency addresses hosted and controlled by the site. To purchase illegal goods and services, users transferred funds into the site's digital currency addresses, where the funds were usually held in escrow until the buyer reported he or she had received the illegal goods or services. AlphaBay collected a 2 to 4 percent commission (approximately) for its role in hosting the platform on which buyers and vendors would transact.

## C. Illegal Goods and Services Sold on AlphaBay

From 2016 through July 2017, AlphaBay was the world's largest online black market. Shortly before it was shut down on July 4, 2017, the AlphaBay site:

- hosted approximately 368,810 listings for the sale of various categories of illicit goods;

- hosted approximately 350,000 active buyer accounts; and

- hosted over 9,000 active vendor accounts.

Vendors categorized their listings among various standardized categories, the vast majority of which were immediately recognizable as illegal to sell, purchase, or possess in the United States and most countries. The AlphaBay homepage listed these under "Browse Categories," which included: Fraud; Drugs & Chemicals; Guides & Tutorials; Counterfeit Items; Digital Products; Jewels & Gold; Weapons; Carded Items; Services; Other Listings; Software & Malware; and Security & Hosting. The majority of items for sale on AlphaBay were illegal drugs of all kinds.

AlphaBay also advised buyers and vendors how to avoid law enforcement detection and explicitly acknowledged that the site's activities were illegal. For example, AlphaBay's Frequently

Asked Questions, accessible from the home page, listed the question "Is AlphaBay Market Legal?," and the response "Some people have really asked this question. Of course not. We are an anonymous marketplace selling drugs, weapons and credit cards. Make sure you access the website through Tor or through a VPN to ensure anonymity. We take no responsibility if you get caught, so protecting yourself is your responsibility."

### D. The Founding of AlphaBay

Between July and December 2014, an individual using the moniker "Alpha02" (referred to as CO-CONSPIRATOR-1 in the indictment) created and launched AlphaBay. According to AlphaBay's publicly posted FAQs, "AlphaBay Market . . . [was] founded by alpha02, reputable member on most carding forums and experienced carders [sic]." After some time helping others on carding forums, he decided to start his own marketplace and allow sellers from around the world to sell goods to buyers worldwide." Early pages of the AlphaBay site listed a "copyright" mark indicating that the site was "proudly designed by Alpha02." The site went live in December 2014.

### E. How to Buy Illegal Goods on AlphaBay

The ordinary purchase process on AlphaBay was much like purchasing goods on any e-commerce site: the buyer browsed to the vendor's page, selected an item for purchase, and clicked the purchase button. The website next verified that the user had sufficient Bitcoin (or other digital currency) in his or her account for the purchase. If so, the site's internal ledger adjusted, the buyer's account was debited the purchase price, and funds were moved (at least on AlphaBay's internal ledger) into an AlphaBay "escrow" wallet. Once the buyer confirmed that the item had been delivered or service had been completed, the internal ledger was again adjusted, the vendor's AlphaBay account was credited the sales price, and the transaction was deemed completed, after which the seller could withdraw his/her newly earned Bitcoin (or other digital currency) from AlphaBay into an address he/she controlled using a PIN code.

AlphaBay and its administrator, Alpha02 profited from every transaction conducted on the website. Specifically, the website imposed a commission for every transaction on the site. The commission rate appeared to vary based on the seller's history, volume, and trust level on the site.

### F. AlphaBay's Organization Was an Enterprise

AlphaBay's day-to-day operations were run by a staff of 8 to 10 individuals, including a security administrator, a public relations manager, and "ScamWatch" personnel (who would watch out for "phishing" attempts and other scams targeting AlphaBay users). AlphaBay also employed a number of "Moderators," who reviewed and moderated disputes among vendors and buyers. The Moderators had the ability to change users' PIN numbers, had discretion to refund buyers' digital currency if they concluded the dispute required it, had visibility into staff-only discussion forums, and could view all AlphaBay users' digital currency balances at any moment. The Moderators included (at least): "Raspi," "Disc0," "Russ0," "Botah," "BigMuscles," "MountainHigh9," and "Atlas." Each was paid a salary through the site for his or her work administering AlphaBay.

AlphaBay constituted an enterprise in that it was an ongoing organization in which its various associates functioned as a continuing unit. The participants of AlphaBay, including HERRELL, operated together in a coordinated manner in furtherance of a common purpose, that is, to gain money through the illegal sales of drugs, stolen identities, firearms, and other items, through an anonymous

Internet platform known as AlphaBay, which operated on the Darkweb, and using payment systems known generally as digital currencies. The participants of AlphaBay, including HERRELL, agreed that they would conduct the affairs of the AlphaBay enterprise through a pattern of racketeering activity, including the trafficking of narcotics, among other crimes, as described herein. The AlphaBay enterprise engaged in or affected interstate or foreign commerce through causing the sale and transport of illegal goods to and from the United States and various countries, including the Netherlands, the United Kingdom, and Canada.

## G. **Defendant HERRELL Was a Moderator on AlphaBay**

HERRELL was a well-known presence in the Darkweb using the monikers "Penissmith," "Realpenissmith," "Cooked," and "Botah," among others. Using these monikers, HERRELL engaged in a number of illegal schemes on the Darkweb. Penissmith's reputation earned HERRELL a position as a Moderator on AlphaBay. As a Moderator (as discussed above), HERRELL adjudicated disputes between buyers and vendors on AlphaBay. As a Moderator, Penissmith/Botah was paid four bitcoins per week for his assistance in administrating aspects of AlphaBay, had full visibility and awareness of the criminal activities conducted on the website, and in many instances directly facilitated these criminal activities through his moderation of disputes. Bitcoin was worth about $2,000 per coin in May 2016, and about $2,600 in July of 2017.

## H. **Defendant HERRELL Moderated Thousands of Disputes and Foresaw Hundreds of Thousands More, Which Constituted Acts of Racketeering**

Records seized from the AlphaBay website show that, using the moniker Botah, HERRELL moderated over 20,000 disputes involving illegal transactions. For example, among the recorded disputes, 709 were designated in the category "meth." While some of the transactions in the "meth" category identified sales for methamphetamine of one gram or less, many of the disputes involved large amounts of methamphetamine. The title of one listing read as follows:

> 1000 GRAMS HIGH QUALITY CRYSTAL METHAMPHETAMINE -
> FREE SHIPPING 50% ESCROW

In the "heroin" category, HERRELL moderated 888 disputes. While some of the transactions in this category identified sales of heroin for one gram or less, many of the disputes involved large amounts of heroin. The title of one listing read:

> !! CHINA WHITE 500G - SYNTHETIC HEROIN !!! FREE SAMPLE
> FOR NEW CUSTOMER

In the "cocaine" category, HERRELL moderated 1,705 disputes. While some of the transactions in this category identified sales of cocaine for one gram or less, many of the disputes involved large amounts of cocaine. The title of one listing read:

> 500 Grams - FISHSCALE COLOMBIAN COCAINE - DISCO SHIT!
> ( (BEST QUALITY/PRICE ON ALPHA -ESCROW 50%)

HERRELL, acting as Botah, moderated disputes in the following additional, exemplar categories:

| Category | No. of Disputes Moderated |
|---|---|
| Fentanyl and RCs [Research Chemicals] | 468 |
| LSD | 800 |
| Steroids | 400 |
| MDMA | 1,960 |
| Buds & Flowers [marijuana] | 3,451 |
| Edibles [marijuana based] | 761 |

During the period of time in which HERRELL was moderating disputes as Botah, the AlphaBay Marketplace facilitated the sale of hundreds of thousands of illegal transactions. The vast majority of these transactions were not moderated by HERRELL because they either: (1) did not require moderation because there was no dispute between the buyer and the vendor, or (2) any disputes were settled by another Moderator on the site. Nonetheless, all of the transactions during this period of time were foreseeable to HERRELL as a member of the enterprise.

As a member of the enterprise, HERRELL agreed that AlphaBay vendors would sell (and did sell) controlled substances, and it was foreseeable to HERRELL that these controlled substances would be in an aggregate quantity in excess of the minimum weight required to attain a base level of 38 according to U.S.S.G. § 2D1.1(a)(5) & (c)(1).

When HERRELL moderated controlled-substance disputes, he agreed to participate directly in those transactions, and in AlphaBay's continuing pattern of racketeering activity. His moderation of those disputes is also evidence that he was aware of the other drug transactions on AlphaBay (e.g., distributions of controlled substance that did not require moderation or that were moderated by someone else). Accordingly, those other transactions on AlphaBay were foreseeable to HERRELL.

## I. Transactions on AlphaBay Were Interstate and International

AlphaBay was used by vendors and buyers to distribute illegal contraband throughout the United States and the world. The site imposed no limits on the state or country of origin when registering a vendor or buyer account; rather, the site was designed to facilitate interstate and international transfers of illegal goods. That is, the site's search options within each product listing category allowed buyers to search not only based on type of good and price, but also "Origin country" and "Ships to" country so users could more efficiently filter only for those goods that could be shipped to their resident country. Additionally, although all transactions on the site were conducted in digital currencies, AlphaBay's Home Page published real-time updates of the price of these digital currencies relative to numerous international currencies, including the U.S. Dollar, Canadian Dollar, Euro, Australian Dollar, and U.K. Pound Sterling.

## J. Forfeiture

The parties agree that the following items were seized from HERRELL, and that they were purchased or otherwise derived from criminal activity described in the indictment:

1. One cryptocurrency wallet containing approximately one Bitcoin,
2. An assortment of counterfeit "Magic: The Gathering" and sports collectible cards,
3. Approximately $745.00 in U.S. Currency,

4.    139 gold coins, one ounce each,
5.    8 silver dollar coins, one ounce each,
6.    One $1,000 bill encased in hard plastic, and
7.    One German August Schwer Cuckoo Clock.

Dated: _____1-2-20_____

_____
BRYAN CONNOR HERRELL,
Defendant