Jeffrey T. Hammerschmidt, #131113
Rena M. Harrison, #330925
HAMMERSCHMIDT LAW CORPORATION
2445 Capitol Street, Suite 150
Fresno, CA 93721
Tel:  (559) 233-5333
Fax: (559) 485-3852

Attorneys for Defendant, Bryan Connor Herrell

UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>vs.<br><br>BRYAN CONNOR HERRELL,<br><br>Defendant. | Case No.:  1:17-CR-00301<br><br>**SENTENCING MEMORANDUM OF DEFENDANT BRYAN CONNOR HERRELL** |

## I.
## SUMMARY OF ARGUMENT

Bryan Connor Herrell pled guilty to a violation of 18 U.S.C. § 1962(d), Conspiracy to engage in a racketeer influence corrupt organization on January 27, 2020. This is a non-violent offense and there are no identifiable victims. Mr. Herrell was in custody following his arrest on November 14, 2017. He was released from custody on bond as of June 22, 2020. The Presentence Investigation Report provides the probation officer's recommendation of 216 months imprisonment and 3 subsequent years of supervised release. The defense requests that the court find that the appropriate sentence in this matter under the guidelines is 216 months.

## II.
## PROCEDURAL HISTORY OF THE PRESENT CASE

According to the Factual Basis for Plea, Mr. Herrell acted as a moderator on a Darkweb marketplace known as AlphaBay. AlphaBay employed at least five other Moderators. All were

paid a salary in digital currency for their duties.  Mr. Herrell moderated approximately 20,000 disputes during his time as a Moderator. AlphaBay had approximately 368,810 listings, 350,000 active buyer accounts and more than 9,000 vendors. (PSR, Pgs. 4-5, paragraph 8.)

Mr. Herrell was arrested at his home on November 14, 2017.  He and his family were cooperative with the FBI investigation.  AlphaBay was taken down On July 4, 2017, approximately four months before Mr. Herrell's arrest. (Presentencing Report Pg. 4, paragraph 8.)

Mr. Herrell pled guilty on January 27, 2020 to a violation of 18 U.S.C. § 1962(d), Conspiracy to engage in a racketeer influence corrupt organization pursuant to a Plea Agreement.

### III.

**A BALANCING OF THE 18 U.S.C § 3553(a) FACTORS WARRANT A SENTENCE OF 216 MONTHS INCARCERATION AS RECOMMENDED IN THE PRESENTENCE INVSTIGATION REPORT**

**A.  Applicable Legal Standards**

Section § 3553(a) provides that the sentence be "sufficient, but not greater than necessary to comply with the specific purposes set forth at 18 U.S.C. § 3553(a)(2)." *United States v. Dorvee*, 616 F.3d 174, 183 (2d Cir. 2010) (quoting *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*); *see also United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006). Those purposes are: (1) the nature of the offense and the history and characteristics of the defendant; (2) the purposes of sentencing, described in § 3553(a)(2) to include (a) the need to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (b) the need to afford adequate deterrence to criminal conduct; (c) the need to protect the public from future criminal conduct by the defendant; and (d) the need to provide the defendant with needed educational or vocational training, medical care, or other

correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the Guidelines and their policy statements; (5) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (6) the need to provide restitution. 18 U.S.C. § 3553(a).

Concerning the Guidelines, post-*United States v. Booker*, 543 U.S. 220 (2005), it is "emphatically clear that the Guidelines are guidelines – that is, they are truly advisory." *Dorvee*, 616 F.3d at 183 (quoting *Cavera*, 550 F.3d at 189) (*en banc*). Although the Guidelines are to be given "fair consideration" "before imposing" a sentence, "in the end, [the Court] must make an 'individualized assessment' of the sentence warranted by § 3553(a) 'based on the facts presented.'" *United States v. Jones*, 531 F.3d 163, 170 (2d Cir. 2008) (citations omitted); *see also Pepper v. United States*, 562 U.S. 476, 487 (2011) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.") (internal quotations and citations omitted). Regarding this individualized assessment, "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also *not to be presumed* reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (emphasis in original). Indeed, the Court "may vary [from the Guidelines range] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quotations and citations omitted); *Gall v. United States*, 552 U.S. 38, 47 (2007) (court need not find "extraordinary circumstances to justify a sentence outside of the Guidelines range").

As discussed below, based on these factors, a sentence of 216 months is well warranted. Additionally, Mr. Herrell requests that he be allowed to self-surrender to the below-requested prison.

**A.  The Nature and Circumstances of the Offense**

Mr. Herrell and defense counsel agree that the Presentence Investigation Report accurately sets forth the nature and circumstances of the offense.

**B.  History and Characteristics of the Defendant**

**1.  History and Characteristics of Bryan Connor Herrell**

At 26 years old, Mr. Herrell should be graduating from college and starting his career and enjoying time with those he loves: his parents and siblings, including his brother, Benjamin. Benjamin Herrell is Mr. Herrell's older brother who relied almost entirely upon Mr. Herrell for the high level of daily care a severely autistic person with a seizure disorder requires. Mr. Herrell has helped his parents care for Benjamin since he was able to and eventually transitioned into Benjamin's fulltime caregiver. *See* Exhibit A- Letter from Janice and Wayne Herrell.

Because Benjamin had such severe cognitive deficits, when Bryan Herrell was born in 1994, their parents were concerned that Mr. Herrell may also share a similar diagnosis. Those fears were founded. Mr. Herrell shoulders a diagnosis of Asperger's Syndrome. *See* Exhibit A- Letter from Janice and Wayne Herrell, pg. 6.

Mr. Herrell was released from Fresno County Jail on June 22, 2020. His parents, Janice and Wayne Herrell are his third-party custodians. Attached as Exhibit C are letters from Mr. Herrell and his parents which discuss what life has been like since Mr. Herrell's release from custody.

**C.  The Purposes of Sentencing under § 18 USC 3553(a)(2)**

Mr. Herrell has specific psychosocial challenges because he has Asperger's Syndrome. 18 U.S.C. § 3553(a)(2) allows the court to consider Mr. Herrell's unique challenges as adequately expressed in the Presentencing Investigation Report in fashioning a sentence.

**1.  A Sentence of 216 Months Incarceration Is Well Warranted**

18 U.S.C. § 3553(a)(2) states the need for the sentence imposed to not only reflect the seriousness of the offense and to promote respect for the law, afford adequate deterrence to criminal conduct, but to also provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Mr. Herrell's specific challenges can be effectively addressed during a period of incarceration of 216 months as recommended in the Presentencing Investigation Report. Mr. Herrell intends to use his time in custody to obtain educational and vocational training. He would like to serve his custody time at an institution that will provide HVAC vocational training.  *See* Exhibit B-Letter from Bryan Herrell.

**2.  Mr. Herrell requests the Court Recommend to the Bureau of Prisons that Mr.**
   **Herrell Serve His Sentence at FPC Yankton or FCI Texarkana.**

Mr. Herrell is aware that he will need vocational training while incarcerated to increase his job prospects upon release. Mr. Herrell is interested in becoming an HVAC technician and has researched which facilities offer this program while still remaining close to his family in Aurora, CO.

Bureau of Prisons Policy Statement 5100.08 explains that "[t]o the extent practicable, placement to the closest facility within 500 driving miles of the release area will be considered reasonable, subject to bed availability, the prisoner's security designation, the prisoner's programmatic needs, the prisoner's mental and medical health needs, any request made by the prisoner related to faith-based needs, recommendations of the sentencing court, and other security concerns of the Bureau of Prisons." The release area is often the prisoners place of residence, and the Bureau prefers to place prisoners within 500 (driving) miles or closer to their place of residence.  *Bureau of Prisons Policy Statement 5100.08*.

Both FPC Yankton and FCI Texarkana offer HVAC vocational training and could provide any other programming necessary for Mr. Herrell. Both facilities are more than 500 driving miles

from Aurora, CO. Mr. Herrell is aware of this and is willing to be placed in either facility because of the vocational training available. Mr. Herrell is eligible to serve his sentence in a camp and requests that he be recommended to serve his sentence at FPC Yankton as a first choice. If FPC Yankton is unavailable or the Bureau determines that Mr. Herrell is ineligible for placement at a minimum-security facility, Mr. Herrell requests that this court recommend he be placed at FCI Texarkana.

## V.
## CONCLUSION

Based on the foregoing, Mr. Herrell respectfully requests that this court follow the sentence recommended by Probation of 216 months as well as make a recommendation to the Bureau of Prisons that he be incarcerated at either FPC Yankton or FCI Texarkana.  Mr. Herrell requests that he be allowed to self-surrender and requests a surrender date at least six weeks after sentencing so that he has sufficient time to schedule and obtain dental surgery as listed in Janice and Wayne Herrell's recent letter.


Dated:  August 24, 2020                    Respectfully submitted,


                                           /s/ Jeffrey T. Hammerschmidt
                                           Jeffrey T. Hammerschmidt
                                           Attorney for Defendant,
                                           BRYAN CONNOR HERRELL

Exhibit A

**Janice and Wayne Herrell**
**6314 South Salida Street**
**Aurora, Colorado 80016**
**303-919-6448 and 720-979-8375**
wherrell1@msn.com

**March 10, 2020**

**Honorable Judge Dale A. Drozd**
**Judge of United States District Court Eastern District of California**
**2500 Tulare Street**
**Fresno, California 93721**

**Re:  Sentencing of Bryan Connor Herrell, Case No. 1:17-cr-00301**

**Dear Honorable Judge Drozd,**

**This document is written entirely by the parents of Bryan Herrell, without any input at all from Bryan**. He has no knowledge we have written this. We hope and pray the information we are providing will assist in determining an appropriate sentence and placement for Bryan. Bryan's mother (Janice Herrell) is a certified Family Nurse Practitioner with advanced knowledge and specialized experience in the Autism disorder.  Her experience with Autism will be discussed in more detail later in this document.

The Bryan we know is a kind, caring, trustworthy, and loyal son.  We also know that is not the impression you get when reading his California Felony case involving his computer and online activities.   Bryan became a totally different person online, compared to the Bryan off his computer. The following information on Bryan Herrell is presented to the best of our knowledge and memory.  We **apologize** for its length, but we want you to know our son.

**Bryan Herrell's Strengths and Work History**
Bryan lived with his parents (Janice and Wayne Herrell) and disabled brother (Benjamin Herrell) until his arrest in November 2017.  His brother Benjamin has severe Autism (non-verbal, cognitive deficits) and a seizure disorder.  Bryan has assisted with the care of his older brother almost his whole life.  Bryan never complained about helping his brother, but instead he would offer to help.  Bryan's calm sweet mannerisms towards Benjamin made their relationship unique and special.  Bryan dealt with a lot of name calling and mean comments from other kids growing up, with much of it, but not all, centering around his brother 's abnormal behaviors.  We saw the hurt and pain Bryan endured.  Despite it all, Bryan's nurturing and kindness towards Benjamin got stronger.  Bryan's 4th grade teacher noticed he was playing with the hearing-impaired children and was helping them as needed.  The teacher remarked how kind he was to everyone in the room.  Bryan started learning sign language to communicate with the hearing impaired.   When Bryan was old enough and demonstrated he was responsible (6th grade), he started getting Benjamin off the special needs school bus and would watch him until

1

we got home from work.  Bryan's older sister was in after-school activities or in college, so we counted on Bryan to care for Benjamin.  Bryan's work history includes caring for his brother Benjamin, assisting us with his grandmother in her declining years, and working on his uncle's farm one summer. Bryan would take his own money and buy items for Benjamin. He also worked with Benjamin on life skills.  During high school, Bryan took his brother to Speech Therapy 1-2 times a week for several years.

After graduating high school, Bryan took care of Benjamin 32- 40 hours a week, while we worked. Benjamin's severe autistic behaviors and seizure disorder both require continuous supervision and daily medication.  Bryan took excellent care of Benjamin and Benjamin was always in a good mood.   Benjamin never had a seizure under Bryan's care, which was not true when he attended Adult Day Care.  Bryan's responsibilities included bathing, feeding, dressing, laundry, reading books, and working puzzles for 8-9 hours a day.  Benjamin's high level of care and difficult behaviors made it impossible for us to find an Adult Day Program to keep Benjamin so we could remain employed.  We never wanted to place a burden on Bryan in caring for his brother, but Bryan offered, and we knew he did an excellent job.  We checked on both boys throughout the day by way of phone calls and home visits. Mom worked from home one day a week.

Bryan was always very kind to Benjamin.  He was always trying to make life better for his brother. We gave Bryan money as pay for his care of Benjamin. He never hesitated to use his own money to buy things for Benjamin.  Examples of items include:  two Ikea mattresses, clothing, food, pillows, blankets, toys, and a backyard kid's swimming pool to sit in when it was hot outside.

For several years Bryan also helped in the care of his grandmother.  Bryan was the one we asked to drive to her Nursing Home facility and take her to medical appointments or bring her to our home when we were unable to do so.  Bryan was always kind and respectful to her and her elderly friends.  Bryan would push his grandmother in a wheelchair during weekly shopping trips to Costco and the mall. Many of the antiques and coins (silver coins, other collectable coins) in our home we inherited from her.  Up until her death in 2012, she gave Bryan money and silver dollars, etc. because he helped her so much.

Bryan was always the quiet, polite person.  We never saw or heard of Bryan arguing or using foul language. His teachers spoke well of him.  He was especially praised for his kindness towards others and above average academic ability (in the gifted classes) during elementary and middle school.  In high school his teachers said he hardly ever spoke in class and appeared to hang out by himself, but always described him as helpful and kind.  He appeared to start losing his desire to attend college his senior year, but he applied to four colleges and was accepted to all four.  He started college seeking a degree in Special Education (received partial academic scholarship) but did not complete his first semester.  He was passing his classes, but his deficits in social skills made it difficult for him to socialize and make friends. He did not want to leave his dorm room even to go eat.  He was living a life of social isolation and we worried about him becoming more withdrawn and depressed. We thought being in a dorm would make

2

his life better, but he had no idea how to effectively communicate or socialize with other people. He was miserable and stayed in his room as much as he could, avoiding people whenever possible. We asked him to come home and he immediately said yes.  Once home Bryan resumed taking care of Benjamin again and he started looking into apprenticeship trade programs, especially electrician apprenticeships.  We paid Bryan in the form of room and board and spending cash for helping with the care of Benjamin and other tasks we asked him to do.  Bryan was also given cash, gift cards, and clothing for his birthday and holidays.  On his birthday before his arrest in Nov 2017, we gave Bryan $ 800.00 in cash, approximately 8-10 gift cards of various amounts and places, and several pieces of clothes.  Years prior we opened a savings account for Bryan and when he graduated from high school the balance was such it would pay for one year of school at most colleges.  Bryan was given the money (not used to pay for college) and he put it in his own bank account to use as he wanted.  We trusted Bryan with every item in our home and never had a reason not to.  Bryan was allowed to go into any room in our home and often he needed to get medication, or money to pay other caregivers for Benjamin.  Bryan never stole from his parents and he had every opportunity to do so if he wanted to.  Gold and silver jewelry, silver and other collectable coins, crystal glass, and some antiques were in open site and he never touched them. We trusted Bryan then and we have no reason not to trust him today. We could always count on Bryan to help us when we needed it. Many times, I (Mom) would accidently leave my pager, cell phone, or notes at home and I would ask Bryan to go in my bedroom and search for the item and bring it to me.  I could always count on him to do what I asked.  He never got angry, mean, or said no.

**We recognize the seriousness of his charge**. We are devastated and still trying to understand why Bryan would be involved in any criminal activity. We believe it is a combination of many factors that led him to do what he did.  He was not raised in a criminal environment.  He was taught to respect the law, be truthful, be kind and caring for others, and overall be a good person.  Our family has never been involved in any criminal activity and Bryan has had no exposure to drugs, guns, violence, or any other activities associated with crime.  Instead, we stressed the importance of working hard, getting a good education, and being a good person. He saw his parents working long hours and trying to manage the care of a severely disabled son (Benjamin) while dealing with other family difficulties.  We could not imagine any child of ours being involved in crime and were shocked to learn of his online activities while we were at work.  We fault Bryan, but we also fault ourselves for not doing a better job of monitoring his online activities and for not effectively communicating to Bryan the importance of living a life with moral integrity.  We also feel responsible because we did not give enough attention to Bryan, but instead focused more on other family members or work. We are heartbroken, but our love and support of Bryan has not changed.  We miss him so much and really want him home as soon as possible.

**We will provide financial support and a home for Bryan to return to.  We will see he receives the appropriate counseling services to be a good citizen in society**.  We will also assist him in finding training and employment with the goal of him becoming self-sufficient and staying away from crime.  Bryan was always there for us when we needed help caring for Benjamin and we always will be there for him.

3

**Psychosocial History (Autism Spectrum Disorder- ASD) and Bryan Herrell**
We believe Bryan's underlying mental disorder, Autism Spectrum Disorder (ASD) led to his criminal behavior. Autism Spectrum is a social, communication, and mental deficit disorder with a wide continuum of symptoms and severity, from barely noticeable to drastically severe.

When Bryan was born, his Pediatrician referred us to a Genetic Counselor and Neurologist. We were told Bryan's chances of having some form of Autism could be as high as 50%, since his brother Benjamin was a male with diagnosis of severe Autism and being non-verbal. When Bryan developed language appropriate for his age, we were convinced he was normal, but over time and multiple medical appointments, health care providers voiced their concerns over Bryan's behaviors placing him in the Autism Spectrum (Asperger's Syndrome).

It was obvious before Bryan was to start kindergarten, he lacked the ability to initiate communication and socialize with children his age.  But everyone was pleased that Bryan, in contrast to Benjamin, could talk and had no apparent learning disabilities.  His cognitive abilities were above average.  We did not start Bryan in Kindergarten until he was 6 years old (under advice of his Pediatrician) because he did not want to talk to anyone outside the family, not even to his Pediatrician. We chose, as advised by multiple health care providers, not to label Bryan with Autism, but instead raise him as a normal child because he was so high functioning. We were also informed high functioning individuals with ASD signs and symptoms can improve over time and lead productive lives.  His Pediatrician thought labeling Bryan with Autism or any communication/social disorder could only cause harm with nothing to gain. We had resisted labelling Benjamin as Autistic, and only allowed it when his school said it was necessary to get services in the Special Education department. At the time, the standard of care and advice of medical professionals was to not label Bryan with any social/communication disorder like Autism because this could prevent future jobs, cause insurance issues, complicate serving in the military, getting into gifted programs, and there was no benefit to him being labeled with such a devastating diagnosis. We were informed there is no cure for ASD, and we should focus on improving Bryan's ability to communicate and socialize with others.

In elementary school Bryan was merely labeled shy, but as he got older it became more apparent that he was not able to interact (socialize) and make friends like his peers. We arranged play/activity groups and signed him up for sports such as basketball, football, and soccer in hopes of improving his social skills.  Bryan took an interest in playing the game of basketball but showed no interest in the players themselves.  At a very early age, Bryan developed an intense interest in anything related to collectible cards. He was given many sports and game cards over the years because that seemed to be his only interest.

We thought card collecting and participating in competition card games such as Yugioh would improve his interactions with others, but it appeared he was only into the cards and not interested in any of the people connected with them. Years later we found out this interest in objects over people is very typical of people with Autism Spectrum or Asperger's Syndrome.  In

4

addition, Bryan's narrow focus of interest in one activity (i.e. cards) is also typical of individuals with ASD.

Many people with high functioning Autism (ASD – Autism Spectrum Disorder) desperately want to fit in and be considered normal, so they will deny all association with Autism. Bryan is one of these individuals. He saw his nonverbal older brother being called a variety of degrading names, and no one would want to see himself so disabled as Benjamin. Because Bryan is so high functioning in the Autism Spectrum Disorder, his disability is often missed by those not familiar with its adult presentation. In addition, Bryan has learned over the years to simulate a normal response in a typical social situation (called camouflaging), and even in the counselling sessions as a teenager he would say he knew the "right answers the counselors wanted to hear".  He wants someone to pay attention to him, but he is unable to fully comprehend the consequences of his actions or words on another person.  It is not that he does not have empathy, but he cannot pick up social cues of others to fully understand their emotions.

Bryan has struggled his whole life to really express how he feels. He never talked very much growing up, and conversations usually consisted of questions followed by short responses from Bryan.  His frequent answer to any question was "what's the point"?  He never smiled or laughed much any time in his life, and as he grew older, the smiles became faint and extremely rare.  We cannot remember the last time we saw him laugh; we believe it was in elementary school. In high school there were times he appeared to have tears in his eyes, but he would deny there was a problem no matter how much we tried to get him to talk.  On more than one occasion we would take him to his Pediatrician and express concerns of possible Depression or maybe Attention Deficit Disorder and Bryan would be referred to a Counselor.  Bryan would always deny having problems to anybody who asked – parents, physician, or counselor. Knowing that depression is often diagnosed in individuals with ASD, starting in high school we constantly worried about Bryan being depressed.

Bryan's criminal activity was on his computer while we were at work or asleep.  We know Bryan **never** drank alcohol, smoked marijuana, or took any drugs of any kind. We obviously missed what he was doing on his computer, but we know he never took any drugs of any kind, nor did he sell drugs.   Bryan made it clear to all that knew him, he was against all of it.  Since his arrest in 2017 (after we were informed by his attorney in Colorado that he was a moderator on Alpha Bay) Bryan said, "**he made money off criminals on the dark web and he was not selling drugs to people**".  We believe Bryan did not fully comprehend the consequences that resulted from his actions on his computer. When he got in trouble earlier in Mississippi and was released without charges, we asked the court to require Bryan to seek counseling.  This did not happen, so I arranged for Bryan to see a Psychologist in Colorado.  Bryan was arrested before he could be seen.

**Supportive Family of Bryan Herrell**
Older brother: **Benjamin Herre**ll (has severe autism, cognitive deficit, and seizure disorder). Benjamin misses Bryan.  Benjamin daily taps the wall photo of Bryan and walks into Bryan's

room looking for him. Benjamin and Bryan have a unique special bond that symbolizes their love and care for each other.

Older sister: **Morgan Herrell** (gifted in all academic areas, sports, an outgoing personality with many friends). BA Degree from Yale University, MA and JD degree from University of Chicago School of Law. Air Force Officer.

Father: **Wayne Herrell**. Age 65. Bachelors and Master's degree. Retired Air Force Officer with 20 years' service, currently employed with a Denver IT Firm.

Mother: **Janice Herrell**. Age 64. 10 year Air Force veteran. Bachelors, Masters, and Post Master's degrees in Nursing. Masters of Science in Nursing degree from the University of California at San Francisco and Post Master's Family Nurse Practitioner from Clarkson College-University of Nebraska. My education also includes several semesters in a PhD program focusing on Sensory Integration Dysfunction related to the Autism disorder. My employment as an Advanced Practice Registered Nurse (APRN) includes over 30 years in hospitals, health clinics, and faculty at two Universities as a Clinical Nurse Specialist and Family Nurse Practitioner (CNS/FNP). I resigned my position (17 years at a Denver Hospital) after Bryan's arrest to focus on my family. I have been identifying signs and symptoms of Autism Spectrum Disorder for over 30 years.

My professional education, many years of clinical practice performing medical history and physicals as a licensed/certified Family Nurse Practitioner, experience raising another child with Autism, and discussions with multiple professionals over the years about Bryan's signs of Autism support the diagnosis of Autism Spectrum Disorder. We would support an evaluation by a Psychologist (expert in Autism Spectrum such as a Forensic Psychologist) if the court questions the diagnosis of Autism Spectrum Disorder and this diagnosis effects sentencing and placement, and thus assist in Bryan's rehabilitation. The Forensic Scientist would want to talk to us regarding Bryan's history. Also, this letter from Bryan's parents would be helpful. Otherwise, Bryan's strength is his cognitive academic ability and his rehabilitation would benefit from Occupational Training, such as an Electrician Apprenticeship. Bryan needs to be surrounded by positive role models who make good decisions in life, and not lifetime criminals to learn from.

Our Family (Herrell family) is currently enrolled in a DNA microarray study related to Autism because of our strong family history of diagnosed Autism and/or symptoms suggestive of ASD in immediate and extended family members. Bryan has not been able to participate because he has been incarcerated.

In summary, over the last 2.5 years (since Bryan's arrest 14 Nov 2017) we have experienced devastating grief that we compare to the unexpected loss of a family member, but worse because we blame ourselves for not preventing it. We are still trying to understand how someone barely out of high school could commit the crime he did, entirely on a computer, doing so while he cared for his severely disabled brother (and he provided excellent care, better than any agency care provider we had in the home). The Bryan we know was not the Bryan online on his computer. It is like Bryan became a different person online. Bryan **never** used, produced, distributed, or sold drugs, nor did he have any exposure to them. Bryan was home

with us in the evenings and on weekends. We felt sorry for Bryan because he didn't have friends that he could call or do activities with, and he appeared lonely and sad to all that knew him.  Bryan hung around with his parents and his brother, not other peers.  We believe Bryan's dark web activities gave him feelings of power and acceptance, something he could not achieve in life off his computer.  We also believe Bryan did not fully comprehend the results of his actions on the computer.  Since then Bryan has expressed his deep remorse for his deeds and has apologized. Bryan needs to be around positive role models in a supportive environment (i.e. home with his family) where the importance of making good decisions, and the consequences if not, are taught.  At home with his brother, parents, and at times his sister (Air Force Officer) he will get the love and financial support he will need to get his life on a good path, away from crime.  All his activities would be strictly monitored and supervised by his parents (mother, retired, would be home with Bryan).  We know Bryan's felony record will limit his future, but we do not want a lengthy prison sentence to dominate his life.  For the past 2.5 years Bryan has been in custody, moving around between multiple jails with nothing to give him or us hope for the future.  We have seen Bryan become more withdrawn, appearing hopeless and depleted of all emotion.  On two separate occasions when we were able to visit him in prison, we noticed he had injuries.  One injury occurred when he was beat up in jail because he was white, and with the other injury, we are not sure what happened.  We know for sure Bryan never started or caused any fight.  Bryan is very passive, never wanting to argue or confront anyone. We do not think any good can come out of him going to prison, for Bryan, our family, or the community.  Without a significant reduction in prison time by the Court, it is very likely we will never see him out of prison due to our age.  Please give us a second chance with Bryan.

With the love and support from his family, professionals in the community to assist with counseling, and vocational training he can still become a positive community member and live a life of integrity.  We believe the best place for Bryan's rehabilitation is home with his family. The lives of every family member, not only Bryan, have been drastically affected and we all need some signs of hope for the future.

We also request Bryan be allowed to Self-Report to the place he is sentenced.  Please allow this to happen. Our family needs this, maybe more than Bryan.  We will make sure he reports as instructed.

**Thank you for taking the time to read this document and for considering it in determining his sentence.**

**Respectfully,**

Janice and Wayne Herrell


*Janice E. Herrell*        *Wayne C. Herrell*

Exhibit B

Dear Judge Drozd                    February 2nd 2020
From Bryan Herrell

I am writing you today because it is likely the last thing I can do to potentially influence my future. The criminal charges against me are significant and I am doing the best I can for myself given the circumstances.

I believe I'm incarcerated currently because of self destructive habits I developed when I was younger. In the last two plus years I've been incarcerated I've come to understand the role laziness and a flawed value system played in my life. I used to think of effort being a type of currency, and spending the least of it was how you "won" in life. This mentality translated into every aspect of my life. People used to think I was shy in school when in reality I just didn't invest the effort into making valuable relationships because I hadn't learned to appreciate them. As a teenager I became significantly isolated which manifested into the charges I have now. At the time of my arrest I was 23, obese and antisocial. I wasn't contributing to the world at all. I should have been getting out of college, starting a career, finding love and being happy. There is a tremendous satisfaction in being genuine and having valued relationships. I have embraced that since my arrest and look forward to it when I

get out.

Something that has changed about me is my mentality towards success. I don't think it was something I even thought about before, but now I look at it like stringing together productive days constitutes success. While productivity is evasive jail, I have managed to break it down into things like exercise, dieting, and honest social interaction. Several days of my routine has turned into weeks, then months. My habits I've developed now are of course petty compared to what I will need to do once released but given the circumstances I feel productive. I want that productivity to continue once I am sentenced and go to prison. That is why after looking at a list of training programs offered at federal prisons I have a desire to be at Federal Prison Camp Yankton because it offers HVAC vocational training and it is relatively close to my family in Colorado. I want to be able to support myself once released and I will absolutely take advantage of any opportunities given to me while in prison.

I am ashamed to soon be a convicted drug trafficker as I have always had a strong dislike for drugs. I was raised in a clean family and never had any desire to try drugs. I had only seen pictures of

most drugs until coming to jail. One may then ask why I agreed to be a part of Alphabay, and the answer is simply greed. I will be excited on my day of sentencing because it will be the first step towards closure on this mistake of mine. I am sorry to society as a whole, and to victims of the organization I was employed by. I am indefinitely embarassed to be in the courtroom in front of you. This experience has humbled me an inmeasurable amount. Thank you so much for your time in reading my letter and dealing with my case.

Regards, Bryan Herrell

Exhibit C

Dear Judge Drozd,

Since your court order has released me from custody I have been at home with my family adhering to the conditions set by the court. I typically visit the grocery store twice a week, along with a few appointments such as a dental exam and getting prescription glasses. I continue to exercise using weights my parents got for me, and eat as healthy as I can. These are two values of mine I intend to take with me wherever I may end up. I am grateful for you enabling my release a few months ago and I think it has been a positive for my mental and physical well being. This time has allowed me to reflect even more on my previous actions, as something about being back in my original home increases how surreal the situation is. It has also let me truly learn the grave impact of my actions on other people, like my mother losing her job as a result. Everything I wrote to you in my previous letter is still true and I would rewrite all of it just to emphasize how much of a mistake I know I made. Thank you for reading my letters, and any consideration with my sentence.

- Bryan Hercell

Janice and Wayne Herrell
6314 South Salida Street
Aurora, CO 80016
303-919-6448 and 720-979-8375
wherrell1@msn.com

Aug 23, 2020

Honorable Judge Dale A. Drozd
Judge of United States District Court Eastern District of California
2500 Tulare Street
Fresno, California 93721

Re: Sentencing of Bryan Connor Herrell, Case No. 1:17-cr-00301

Dear Honorable Judge Drozd,

        We'd like to give you an update on our son Bryan and tell you we are so very grateful that we have been able to have this time with him back in our home. These last few weeks, we have made good use of the limited time we have, catching up on his healthcare needs after over 2 ½ years in confinement. Bryan has been steadfastly sticking to a very healthy diet and exercise. We know he developed vision problems during his incarceration, and we've finally gotten him eyeglasses, plus medical and dental exams. Due to our strong family history of diabetes, stroke, and heart disease, he is being evaluated with a physical exam and lab work. He also will be getting surgery on his gums soon; we have a consultation scheduled the afternoon of September 16, 2020.

        We can see Bryan has changed a lot since he was taken in 2017; he is aware of his boundaries and does not at all try to push them. He knows he has a difficult path ahead with many uncertainties, but he's determined to make the best of whatever opportunities he can in terms of learning an honest trade and how to manage his life. This whole experience has given him an increased sense of empathy for the feelings of others. He realizes now that his internet actions had real life consequences on real people, and that these things matter. There is a certain amount of shame and remorse of course, but he is resisting the tendency to freeze in that stage. He is working on re-ordering his life in a constructive way.

        In summary, we, and Bryan, desire nothing more than to bring something positive out of the sad events of these lost years. We want to do whatever we can to help him get on the right track, and we deeply appreciate anything that can be done during his sentencing and placement phase that moves him in that direction.

        Again, our heartfelt gratitude for granting his release to us.

Respectfully,

Janice and Wayne Herrell


*Janice E Herrell*                    *Wayne C Herrell*
_____              _____